Argued and submitted January 16, 1987, affirmed June 1, 1988

## PORT OF PORTLAND,
*Respondent,*

*v.*

## BILIC et al,
*Appellants.*

## (A8510-06256; CA A39250)

757 P2d 423

Russell M. Allen, Portland, argued the cause for appellants. With him on the briefs was Parks, Montague, Allen & Greif, Portland.

William P. Buren, Portland, argued the cause for respondent. On the brief were Kim Jefferies and Wood, Tatum, Mosser, Brooke & Landis, Portland.

Before Richardson, Presiding Judge, and Newman and Deits, Judges.

RICHARDSON, P. J.

## RICHARDSON, P. J.

Defendants appeal from a judgment which enjoins them from continuing to provide ground transportation for United Airlines (United) flight crews between Portland International Airport and downtown hotels. Plaintiff (Port), which operates the airport, asserts that defendants' transportation service violates an exclusive franchise that Port awarded to Raz Transportation Company (Raz) to provide transportation services on that route. Defendants contend that the exclusive franchise is beyond the Port's authority to grant for several reasons. We affirm.

■ Because the complaint sought an injunction and is in equity, we review *de novo.* The essential facts are undisputed. It is, however, important to put the facts in an appropriate framework and to elaborate on the purposes of the Port's regulatory ordinances.

For many years, Dart, Inc., held an exclusive franchise permit issued by the Port to transport passengers from the airport to downtown Portland. Airline crews arriving at the airport, including United's, used Dart buses for transportation to downtown. In 1985, Dart ran into financial difficulties and went out of business. As a result, there were no transportation facilities to provide the services which had been offered by Dart. The Port engaged the services of another transportation company on a temporary basis while bids were being processed for a new franchise holder. Just after Dart ceased operating, United orally agreed with defendant Tom Bilic that he would transport its crews to layover hotels in downtown Portland and return them to the airport in time for their flights. He was paid directly by United for the service.

The other transportation company complained to the Port that Tom Bilic was transporting passengers, which it understood were included in the temporary exclusive permit. The Port contacted Bilic and negotiated an agreement that, at least in the contemplation of the Port, he would continue to carry United crews only until a new franchisee had been selected. The Port subsequently learned that Tom's daughter, defendant Carmine Bilic, had signed an agreement with United to transport its flight crews. When she refused to honor the Port's demand that she desist, it sought a temporary

injunction, which was denied, and a permanent injunction, which was allowed.

■       The ordinances involved were adopted by the Port pursuant to specific statutory authority. ORS 778.260. By Ordinance 212, the Port specified which ground transportation facilities were required to have permits. Section 3.2 provides, in part:

"Only limousine or bus companies holding permits issued by the Port may operate at or upon the Airport * * *."

The authority to regulate certain activity is specified, somewhat obliquely, by Ordinance 317-3.1,[1] which provides in relevant part:

"(1)   No person shall engage in any public commercial activity at the airport without the prior approval of and under terms and conditions prescribed by the Port."

The parties agree that the Port's authority to grant a permit to Raz and deny one to defendants to transport passengers to downtown Portland is derived from those ordinances. The Port asserts, and defendants agree, that, under the authority of the ordinances, the Port can grant an exclusive permit to engage in "public commercial activity" or limit the number of permits for a particular "public commercial activity." The parties disagree as to whether the service provided by defendants to United crew members is a "public commercial activity" and, therefore, encompassed by the ordinance. Subsection 2 of ordinance 317 provides, as material:

" 'Public commercial activity' means any activity directed to the general public undertaken for profit or personal gain."

The gravamen of defendants' argument is that, although they are engaged in commercial activity of carrying passengers for profit, the activity is not directed to the general public. They assert that, because they provide a service narrowly tailored to the needs of United crews, and do not direct their services to the general public, their activities are not covered by the ordinance and, therefore, not subject to regulation. This argument inverts the ordinance and, consequently,

---

[1] Ordinance 317 was adopted in March, 1985, but the language involved in this case is the same as in Ordinance 266, adopted in 1980 and repealed by the adoption of Ordinance 317.

would put regulation of activities at the airport in the hands of the regulated.

Ordinance 317 contains a section denominated "Findings and Purpose." Included in that section is:

> "The Port of Portland finds: * * * (b) that the unregulated use of its airports pose a threat to the peace, health, economic vitality, and safety of persons living in the community and other citizens utilizing Port of Portland airports; * * * (e) that establishing reasonable regulations at its airports limiting commercial and noncommercial activity within the airport are essential * * *."

The final paragraph of the section provides:

> "The purpose of this Ordinance is to enact regulations consistent with the above findings and this ordinance and the regulations published pursuant thereto shall be liberally construed to effectuate the purposes expressed herein."

A Port official elaborated on some of the purposes of commercial activity regulations and the limitation of permits for such activity. He testified that the Port grants exclusive franchise permits in order to provide consistent, reliable, convenient and relatively inexpensive transportation service to persons who come to and leave the airport. He explained that, in the Port's experience, an exclusive franchise covering a particular transportation market was necessary to maintain a financially viable operation. The president of Raz testified that the company bid on the franchise on the basis that airline crews would be included in the exclusive transportation market. The projected income from United would be $5,000 per month and, he testified, the loss of that revenue would require Raz to reduce service or effect economy measures that may affect service in order to operate at a profit. In essence, if United and other airlines were permitted to provide a separate transportation service for their crews to the inner city, the balance of the public needing transportation could not be adequately served.

Another purpose of the limited permit approach identified by the Port official is the need to control traffic. He explained that there is a limited area reserved for commercial transporters to pick up passengers. He concluded that, if the several airlines which use the airport selected different limousine companies for their crews' convenience, the Port would

have a major traffic problem. There is nothing in the record to discredit those projections.

The term "general public," as used in the ordinance applicable only to the airport, does not necessarily encompass all individuals in the state. Insofar as that term relates to transportation services and defines the Port's authority to grant permits for that activity, it includes only those individuals who need transportation from the airport. That is the general activity which the Port seeks to regulate by Ordinances 317 and 212. The fact that United crew members are private employes does not control their status when they are engaged in activity outside the sphere of influence of the employer. When a crew member steps to the curb seeking a commercial ride to downtown Portland, that person becomes part of the commercial activity which the Port seeks to regulate by Ordinance 317. The activity subject to regulation is defined in the ordinance from the perspective of the regulator. Defendants' interpretation and application of the ordinance would allow various commercial transportation providers to define the scope of their activity and thus to be outside of the Port's regulatory authority. In essence, the ordinance defines and regulates a type of activity and not a particular contract relationship that deals with only a defined portion of the public commercial activity.

Defendants' interpretation of the ordinance could have some far-reaching and unintended results in terms of the Port's attempt to regulate activity at the airport. There are 15 commercial airlines which have permits to use the airport facilities and a number of other commercial establishments such as restaurants, retail stores and cocktail lounges. Under defendant's interpretation each could provide transportation for its employes by contracting with a limousine service. The lucrative part of the transportation market would be carved into a number of separate contracts, leaving other uneconomic transportation services wanting for a provider. Travelers who could not qualify for one of the limited transportation services would have to use private transportation or taxis to leave the airport. The record indicates that the airport already has a major traffic problem; it takes little imagination to foresee the debilitating chaos from the added number of vehicles. The

Port's regulatory authority would be at the whim of the commercial transportation providers. We conclude that the language and intent of the ordinance are contrary to defendants' understanding.

■ Defendants also argue that the Port lacked authority to enact ordinances which regulate conduct outside the airport. Defendants miss the point. The Port seeks only to regulate who may enter onto the airport premises to pick up passengers for transportation to downtown Portland. It does not seek to regulate conduct outside the airport premises. ORS 778.260(1) provides:

> "The board of the Port of Portland * * * may by ordinance make, modify or abolish regulations as convenient or necessary to provide for policing or regulating the use of airports, and any facilities located at or in conjunction with airports owned, operated, maintained or controlled by the Port."

In *Flamingo Motel v. Port of Portland,* 9 Or App 599, 497 P2d 673, *rev den* (1972), we upheld an ordinance requiring hotels and auto rental companies that pick up customers at the airport to obtain a Port permit and to pay an accompanying fee. We noted that the only portion of the plaintiff's business activities directly affected by the ordinance was the entry of the vehicles into the airport to pick up passengers. For the same reason, regulation of defendants' activity is within the Port's legislative authority.

■ Defendants next assert that the Port's refusal to issue a permit to Carman Bilic to transport United crews places an unreasonable burden on interstate commerce.[2] The trial court questioned whether defendants' limousine service is a part of interstate commerce. If it is not, its regulation falls outside the Commerce Clause. *See United States v. Yellow Cab Co.,* 332 US 218, 67 S Ct 1560, 91 L Ed 2010 (1947); *Airport Taxi Cab Advisory Comm. v. City of Atlanta,* 584 F Supp 961, 964-65 (ND Ga 1983).

A determinative factor in deciding whether a particular mode of transportation between an interstate airport or train station and a local destination constitutes interstate

---

[2] We noted in *Flamingo Motel v. Port of Portland, supra,* 9 Or App at 607, that the Port's use of its legislative powers to exclude commercial vehicles from picking up interstate travelers at the airport might raise interstate commerce issues.

commerce is the character of the arrangements between the transporter and the passenger. A traveler who merely takes a taxi from an airport or train station is generally not within the stream of interstate commerce. *United States v. Yellow Cab Co., supra,* 332 US at 230-33; *Evanston Cab Co. v. City of Chicago,* 325 F2d 907 (7th Cir 1963), *cert den* 377 US 943 (1964); *Airport Taxi Cab Advisory Comm. v. City of Atlanta, supra,* 584 F Supp at 964. Transporting such customers is merely "casual and incidental" to the taxi's normal business of providing service to *any* passenger seeking transportation. *United States v. Yellow Cab Co., supra,* 332 US at 231-32. On the other hand, transportation which is arranged before the interstate traveler's arrival is usually not casual or incidental to the interstate travel. Rather, it is an integral part of the interstate traveler's journey and is interstate commerce, even when the arranged trip is entirely within the boundaries of one state. *United States v. Yellow Cab Co., supra,* 332 US at 228; *Executive Town & Country Services v. City of Atlanta,* 789 F2d 1523 (11th Cir 1986); *Charter Limousine v. Dade Cty. Bd. of Cty. Com'rs,* 678 F2d 586 (5th Cir 1982); *Southerland v. St. Croix Taxicab Association,* 315 F2d 364 (3rd Cir 1963); *Continental Bus System, Inc. v. City of Dallas,* 386 F Supp 359 (ND Tex 1974).

Most, if not all, United crews arriving at the airport disembark from interstate flights. A majority stay in Portland for brief layover periods before beginning new interstate journeys. The limousine service that defendants provide is part of a transportation system created for the benefit of airline employes who were in the stream of interstate commerce. We conclude that defendants' limousine service is interstate in character. The issue, then, is whether the exclusive franchise given Raz, which excludes defendants' service, imposed an unreasonable burden on interstate commerce.

The Commerce Clause is intended to protect the interstate market as a whole, not particular business interests, from prohibitive or burdensome regulations. *Exxon Corp. v. Governor of Maryland,* 437 US 117, 127-28, 98 S Ct 2207, 57 L Ed 2d 91 (1978); *Executive Town & Country Services v. City of Atlanta, supra,* 789 F2d at 1526-27. State regulation of interstate commerce which regulates evenhandly and which imposes an incidental and not clearly excessive burden on interstate commerce is permissible. *Pike v. Bruce Church, Inc.,*

397 US 137, 90 S Ct 844, 25 L Ed 2d 174 (1970); *Executive Town & Country Services v. City of Atlanta, supra,* 789 F2d at 1527. The extent of the permissible burden depends on the nature of the local interest and whether there is a less restrictive alternative which would impose a lesser burden. *Minnesota v. Clover Leaf Creamery Co.,* 449 US 456, 471-73, 101 S Ct 715, 66 L Ed 2d 659 (1981); *Hughes v. Oklahoma,* 441 US 322, 331, 99 S Ct 1727, 60 L Ed 2d 250 (1979).

Defendants have described how the Port's enforcement of the ordinances and the exclusive franchise has affected their business. However, they have failed to suggest how the Port's policies unreasonably impede interstate travel. Defendants have the burden to show that the regulation unduly burdens interstate commerce, not simply that it damages their private interests. *Procter and Gamble Company v. City of Chicago,* 509 F2d 69 (7th Cir), *cert den* 421 US 978 (1975); *Park 'N Fly of Texas, Inc. v. City of Houston,* 327 F Supp 910 (SD Tex 1971). Although United may be inconvenienced by the injunction against defendants' service, it is not a party to this case.[3] Even if United were a party, the service which Raz provides is an adequate alternative for the transportation of its crews. A Raz employe testified that it could and would adjust its schedule to meet most of the United crews' transportation needs.

The purpose of the Port's grant of an exclusive franchise is to ensure regular and financially viable limousine transportation for *all* interstate travelers. United crews constitute a portion of interstate travelers. Even if the franchise results in some inconvenience to them, the Port could properly decide that it promotes the interests of a majority of interstate travelers; on this record we could not say that it is wrong. Other cases have upheld such regulation of transportation services between airports and core areas. *Continental Bus System, Inc. v. City of Dallas, supra; Motor Co. v. Transit Co.,* 124 Colo 147, 235 P2d 580 (1951); *Miami Beach Airline Service, Inc. v. Crandon,* 159 Fla 504, 32 So 2d 153 (1947). In cases that have struck down such monopolies, the opponents have shown that they impeded interstate travel. *Charter Limousine v. Dade Cty. Bd. of Cty. Com'rs, supra; Toye Bros. Yellow Cab*

---

[3] The trial court denied defendants' motion to join United as a party, and United did not move to intervene.

*Company v. Irby,* 437 F2d 806 (5th Cir 1971); *Southerland v. St. Croix Taxicab Association, supra.*[4]

■ Defendants next assert that the injunction constituted a breach of the port's operating agreement with United. They lack standing to assert the rights of a party that is not before the court and whose interests they do not represent. *See* n 3, *supra; Ellis v. Municipal Reserve & Bond Co.,* 60 Or App 567, 655 P2d 204 (1982); *Kelly v. Silver,* 25 Or App 441, 451-52, 549 P2d 1134, *rev den* (1976).

Defendants' final claim is that the equities do not support the trial court's decision to grant a permanent injunction. We disagree.

Affirmed.

---

[4] Restrictions on ground transportation from the airport to outlying areas were somewhat more onerous in each of these cases than those which the Port imposed. In *Southerland* and *Charter Limousine,* local transportation regulations barred tourist and business charter groups from using local transportation for which they had already paid. In *Toye Bros,* the exclusive franchise precluded direct transportation from the New Orleans airport to points along the Mississippi coast in other states. In this case, the franchise creates a limited monopoly *only* on transportation service between the Portland airport and downtown. It does not impede direct transportation between the airport and outlying locations.